ELIZA REMILLARD, Administratrix of the Estate of JOSEPH
REMILLARD, JR., Deceased, v. SIOUX CITY TRACTION
COMPANY, Appellant.

**Street railways:** CONTRIBUTORY NEGLIGENCE: WHEN A FACT QUESTION.
1  When the motion and noise of a passing train was likely to
divert the attention of a pedestrian he cannot be said, as a
matter of law, to have been negligent in failing to observe an
approaching street car.

**Same:** INSTINCT OF SELF PRESERVATION. Where there is no direct
2  evidence of an accident the instinct of self-preservation will
support a finding of want of contributory negligence.

**Same:** NEGLIGENCE OF MOTORMAN. It is the duty of the motorman
3  of a street car, when passing through a thickly settled por-
tion of a city, to anticipate and keep a lookout for pedestrians
traveling the intersecting streets; and where it is shown that
he might have seen deceased had he looked, and he testified
that he did not see any one, the jury might have found that he
was negligent in not discovering deceased and in running him
down.

**Same:** EVIDENCE. Evidence reviewed and held to warrant a find-
4  ing that a collision of defendant's street car with deceased oc-
curred at a street crossing.

**Same.** Evidence held to support a finding that the motorman, in
5  the exercise of reasonable diligence, might have stopped his
car after observing deceased in time to have avoided the acci-
dent.

*Appeal from Woodbury District Court.*— HON. DAVID
MOULD, Judge.

THURSDAY, APRIL 9, 1908.

REHEARING DENIED, MONDAY, JUNE 8, 1908

ACTION for damages resulting to the estate of plain-
tiff's decedent from his alleged wrongful death. From
judgment against it, the defendant appeals.— *Affirmed.*

*Jos. S. Lawrence,* for appellant.

*A. Van Wagenen,* for appellee.

LADD, C. J.— Joseph Remillard and his wife had come from Jefferson, S. D., to Sioux City, with two loads of wheat, January 10, 1905, and, as the mills had closed for the day, drove their teams to the residence of one Bellows at the corner of Second and Main Streets. Failing to find a stable, one team was blanketed, and shortly after eight o'clock in the evening Remillard started for the business portion of the city about ten blocks distant to procure a pair of blankets for the other team. The defendant's line of railway running through Riverside Park to the business center of the city crosses Main street near Bellow's residence, and then extends eastward over Sioux, Market and Bluff streets, in the order named. Between these streets the line passes through the blocks diagonally over a right of way of the company. Parallel with the track, and about twelve feet south of it, is the track of the Chicago, Milwaukee & St. Paul Railway Company. Bellows saw deceased start towards the defendant's line, and, as he did not return as expected, went after him at about eleven o'clock, when, upon inquiry, he found his body at the morgue. He had been struck by a car of the defendant company at about eight-thirty o'clock, either when on Market street, as the jury found in answer to a special interrogatory, or at a point about ninety feet east of Market street. The court submitted to the jury whether the defendant was negligent (1) in running its car at an excessive rate of speed; and (2) in not stopping it after deceased's danger was known or should have been known in time to avoid the injury.

Appellant challenges the sufficiency of the evidence to sustain the verdict on either of these grounds, or to sustain the finding that the deceased was not at fault in getting in the way of the car. It will be observed that the deceased

was going toward the business center of the city, as was the defendant's car. At the same time a freight train was moving in the same direction on the track of the Chicago, Milwaukee & St. Paul Railway Company. The evidence on the part of the plaintiff tended to show that this train was moving at about eight miles per hour, and that the car of defendant was moving at about twice that speed; that, when the car reached Market street, the train had passed that point, save two or three freight cars and the caboose; while that in behalf of the defendant tended to show that the freight train was moving at the rate of about six miles per hour and the street car at about half that speed. There was what the witnesses designated a shoulder off the Chicago, Milwaukee & St. Paul Railway Company's track about five or six feet from the rail where a person could walk even between passing trains, though one not accustomed to be around cars would not be likely to do so, but move farther away from the passing train. The motion of the train, together with the accompanying noise, was likely to divert a pedestrian's attention, and, in view of this, it cannot be said as a matter of law that deceased was negligent in not observing the approach of the street car. See *Perjue v. Citizens' Light & Gas Co.*, 131 Iowa, 710.

*1. STREET RAILWAYS: contributory negligence: when a fact question.*

Moreover, if the collision occurred at the crossing, there was no direct evidence thereof and the instinct of self-preservation furnished sufficient basis for a finding of want of contributory negligence. *Bell v. Inc. Town of Clarion*, 113 Iowa, 126. The evidence was sufficient to carry the issue as to whether the deceased was at fault to the jury.

*2. SAME: instinct of self-preservation.*

II. There was a full moon and some clouds through which it shone, but the motorman testified that with the aid of the headlight he could have seen a person on the track a block and a half away. From Main street to the business center of the city was

*3. SAME: negligence of motorman.*

'thickly settled, so that, in the exercise of ordinary care, it was the duty of the motorman to anticipate and keep a lookout for pedestrians traveling on the intersecting streets; and, as he could have seen had he looked and it was his duty to keep a lookout, and he testified that he did not see anyone there, the jury might have found that the defendant was negligent in not discovering deceased at the crossing and in running him down, if the collision occurred in Market street. *Doran v. St. Ry. Co.,* 117 Iowa, 442; *Barry v. St. Ry. Co.,* 119 Iowa, 62; *Doherty v. St. Ry. Co.,* 137 Iowa, 358.

Appellant insists, however, that the evidence was insufficient to sustain the finding that the collision occurred on Market street. As already noted, the motorman testified 4. SAME: evi- that no one was at that street when the car
dence. passed, and plaintiff necessarily relies on evidence of tracings on the frozen ground and another circumstance to prove otherwise. Early the following morning two brothers of plaintiff, her attorney, and the father of the deceased looked over the scene of the accident, and the said brothers testified that at a point between ninety-nine and one hundred feet east of Market street there were blood stains on the ground between the rails, the earth had been disturbed some as though something had been dragged along; that about twenty-four feet west of the blood stains there was a slight depression, shaped like a man's skull, extending lengthwise about two feet, and about six or eight inches wide, with hair pressed into the earth and frozen in. The hair was gray and dark brown, of a length and color of that of deceased, as some of the evidence tended to show. A chunk of earth was chopped out from this place and introduced in evidence. Also there were two marks, each a half or three-quarters of an inch wide, four to six inches apart, extending from three to four feet east of Market street to the depression mentioned, where they disappeared, and appeared again three or four feet farther on, and con-

tinued to the blood stains, but did not extend beyond, and throughout the entire distance the dust was brushed as though something had been dragged along on the ground. The body was at or near the blood stains when the car stopped. The circumstance alluded to is that described by a witness looking out of a window at Market street to catch sight of a brakeman on the caboose to the freight train, namely, that the street car jerked three times in crossing the wagon way in the street as though the brakes were being set. The evidence that the cap of deceased was pulled down over his ears when taken from the ground is undisputed, but there is a conflict in the evidence as to the character of the wound on the head; plaintiff's brother testifying that " his scalp had been torn off from the back of his neck up pretty near to the top of his head. It was torn loose at the lower end, . . . very nearly laid open so it looked as though it was torn up to the top about. . . . There were scarcely any hairs on the scalp."

On the other hand, the undertaker and his assistant testified that the scalp was undisturbed, but that there was a cut about three inches long on the back of the head which in their judgment was covered by the cap. To this evidence should be added the testimony of the engineer of the train that no person was walking between the tracks of the two companies east of Market street as testified by the motorman, and the speed of the car, and we have facts sufficient to justify the inference that the collision took place some distance east of where the traces on the ground first appeared. True, something else might have caused these; and yet, in view of their character and of the fact that they began where he would have been likely to have fallen if struck at the crossing, and ended where his body was found, together with the depression with indications that his head had been pressed to the ground at that point and the absence of other explanation, if the motorman's account were rejected as it might have been, no other reasonable conclusion could well

have been reached than that the impact of the car must have occurred before leaving the street, and probably when the witness saw the jerking of the car. That such evidence is sufficient appears from *Asbach v. Railway,* 74 Iowa, 248, and *Tibbits v. Railway,* 138 Iowa, 178. With nothing but the tracings, it might not be inferable that these were caused by the body of a person; but with a man found under the street car at the extremity of the tracings on the ground in a situation likely to have caused them, in connection with the evidence of the speed and the jerking of the car, the story of the motorman discredited by that of the engineer, in the absence of other explanation, the inference that the man so found was dragged over the space indicated by the tracings was the only one reasonably to be drawn. We are of the opinion that a case was made out for the jury, and that the answer to the special finding has support in the evidence.

III.   The other issue submitted to the jury was whether, after the motorman saw deceased by the exercise of ordinary diligence, he could have stopped the car in time to have avoided the injury. This

5. SAME.

eliminated any question of deceased's negligence in being where he was. The track was over the company's right of way, so that the motorman might have proceeded on the theory that deceased would not go thereon until it appeared that he was doing so without noticing the approach of the car. The motorman was the only eyewitness, and, according to his story, he did not see the deceased until the front of the car was forty feet east of the street and moving at the rate of three miles an hour; that deceased was then fifty feet ahead and over near the other track coming from the shadow of the freight cars, and about twelve feet from defendant's track; that he was moving diagonally eastward over the shoulder of ground along the Chicago, Milwaukee & St. Paul Railway Company's track toward the center of defendant's track, and, when he attempted to step between the rails, the street car had moved

some thirty feet; that the motorman then had the slack out of the brake chain, and did his utmost by putting on both the hand and electric brakes and reversing the current, and stopped the car in a distance of thirty-five feet, fifteen feet after the headlight hit deceased in the back of the head; that the collision occurred sixteen feet from the place where he first saw him; that, when deceased first began walking toward the track, he sounded the gong, which deceased did not appear to hear; that deceased was walking rapidly, and moved east about eight feet after first seen; that when struck he "apparently turned a somersault." This witness testified from measurements made the next day and was of opinion that the "rail was pretty fair that night. It had not rained. The rail had been run over all day and was reasonably dry. It was not in good shape as it could be. It was a cold winter night; that is not like a summer night. It was as good as it could be at that time of the year. There was no white frost nor anything on the rail." The jury might have accepted this statement, though another witness of the defendant testified that the rails were "sweaty and frosty." There was a slight decline in the track toward the east. Two witnesses called by plaintiff testified that in their opinion a car moving at the rate of three miles per hour with rails in reasonable condition for that season of the year could be stopped in moving ten feet. On cross-examination one of these witnesses thought, if there was an incline, it would go farther, and that it could not be stopped as quickly with a single as with a double motor, and that, if the rails were more or less slippery, it might move twenty or thirty feet in being stopped. The other witness, who had been motorman for eight years, was of the opinion that the decline was not enough to make much difference, but that, if the night was frosty and the rails in a condition the frost would naturally leave them, it could not be stopped so quickly, and that under these conditions twenty feet would be a good stop; that if the rail was slippery, and it slid, it

ought to be stopped in thirty feet or less; that, if it did not slide, it should be stopped within fifteen feet. On the other hand, two witnesses called by defendant estimated the distance within which the car could have been stopped at from forty-five to fifty-five feet. It makes little difference which of these estimates be accepted; for, if the car could have been stopped in twenty feet or less, it could not have reached deceased; if in thirty feet, it could not have reached him, for at twenty feet its speed must have been reduced two-thirds or to a mile an hour, and, as he was walking rapidly, he would have left it behind as would have been the case if forty-five to fifty-five feet would be required, as in that event the speed of the car would have been reduced to two miles an hour in going the twenty feet. But the jury might have accepted the motorman's testimony as to the condition of the rails, especially as no claim is made that the car in fact slid, and the opinion of the witnesses called by plaintiff as to the distance within which the car could have been stopped, and thereon based a finding of defendant's negligence.

IV. Numerous exceptions to the rulings of the court during the trial and to the instructions are preserved in the record, but none of them are well taken or are sufficiently doubtful to call for extended discussion.— *Affirmed.*