BERTHA CARR, Administratrix, Appellant, v. INTER-URBAN RAILWAY COMPANY, Appellee.

NEGLIGENCE: Jury Question. Evidence in a personal injury case 1 reviewed, and held to present a jury question on the issue of defendant's negligence (1) in not keeping a proper lookout for persons on the track; (2) in operating the car at a dangerous rate of speed; and (3) in failing to stop the car, in view of deceased's dangerous position.

NEGLIGENCE: Contributory Negligence—Jury Question. Evidence 2 in a personal injury case reviewed, and held to present a jury question on the issue of deceased's contributory negligence in walking in the nighttime along a street and on the tracks of a street railway.

*Appeal from Polk District Court.*—J. D. WALLINGFORD, Judge.

FEBRUARY 11, 1921.

REHEARING DENIED MAY 10, 1921.

ACTION to recover damages for personal injuries and death of plaintiff's intestate. Plaintiff appeals from a directed verdict in favor of defendant.—*Reversed.*

*Clark, Byers & Hutchinson, R. P. Thompson, Charles S. Rowe,* and *Gregory Brunk,* for appellant.

*W. H. McHenry* and *C. R. Bennett,* for appellee.

PER CURIAM.—It is alleged that, at about 6 A. M., December 1, 1916, while it was still quite dark, deceased was walking from his home to his place of work, on the east side of East Thirty-third Street, and north of Cleveland Avenue, in Des Moines; that, in doing so, it was necessary for him to cross the tracks of defendant; and that, while passing over, upon, or across defendant's tracks, at a point in East Thirty-third Street, near the intersection of said street and Cleveland Avenue, he was struck by one of defendant's outbound cars, receiving injuries from which he died a few hours later; that there was no sidewalks in that vicinity; and that, at the time deceased was so struck, he was following the footpath along defendant's tracks which had been made and habitually used by pedestrians in that vicinity, with the knowledge of defendant and its employees; that defendant has a double track on East Thirty-third Street, running substantially north and south, with an upgrade to the north; that deceased was struck by one of defendant's north-bound interurban cars, while proceeding north along defendant's east track; that, immediately before deceased was struck, a street car of the Des Moines City Railway proceeded down hill toward the south, on the west track, past deceased; that, the street car being lighted, the attention of the deceased was attracted thereto, as it approached and passed him in the darkness, and by reason thereof, and on account of the darkness and the confusion, noise, and lights of the passing street car, and by reason of the negligence of the defendant, deceased failed to notice defendant's inter-

1. NEGLIGENCE: jury question.

urban car in time to avoid injury to himself; and that he was free from contributory negligence.

The negligence charged is: 1. That the motorman in charge of defendant's car did not have proper control over the same. 2. The motorman failed to keep a proper lookout ahead, whereby he would have seen deceased in time to have stopped the car and avoided striking him. 3. The motorman failed to put into motion means of stopping his car, after seeing deceased in a place of peril upon the tracks, and to be on the lookout in time to have stopped the car before striking deceased. 4. The car was operated at a high and dangerous rate of speed. 5. The car was not equipped with proper headlight to enable the motorman to see deceased in time to avoid striking him.

Defendant denied generally, and alleged contributory negligence. No evidence was introduced on behalf of the defendant. We must give plaintiff's evidence and the legitimate inferences to be drawn therefrom a construction most favorable to plaintiff.

Deceased lived on North Avenue, west of East Thirty-third Street. He was proceeding to his work, and was injured while proceeding along defendant's tracks on East Thirty-third Street, and a block or so south of the place where he was to work. He had just passed Cleveland Avenue, and was walking between the rails of defendant's east track. After the car stopped, a person living in the neighborhood came out and measured the distance from the north line of Cleveland Avenue to where deceased lay, between the east and west tracks. Witness says that deceased, at that time, lay east of the west line of East Thirty-third Street, and 20 feet north of the north line of Cleveland Avenue; that the head of deceased was near the east rail of the west track, with his head to the south, between the two tracks. Defendant's tracks do not run exactly north and south, but slightly to the northeast at Cleveland Avenue, and for a ways north. There is a street light on the south line of the crossing, just east of the east track. The evidence shows that, from Cleveland Avenue south, the railroad is in East Thirty-third Street. It was in East Thirty-third Street at the point where deceased was struck. Plats and photographs were used in evidence, showing the point where plaintiff was injured,

where Thirty-third Street begins, and where the so-called private right of way of the company commences and ends. There is a beaten path between the rails. It appears from the evidence that, in going from the home of deceased to his place of work at Carpenter's, one would naturally follow the interurban tracks. The interurban track turns from North Avenue to the north or northeast, some distance west of East Thirty-third, the rails of the track at the bend being about 600 feet west of East Thirty-third. It was the custom of the public traveling in that vicinity to follow the track around the bend from North Avenue, north across other east and west streets, striking East Thirty-third on the tracks at Cleveland Avenue. Defendant's right of way extended north from North Avenue to Cleveland. Thirty-third Street was not paved. The street light was lighted, and a witness says she saw deceased walking up the tracks a little north of the crossing, and saw him by the street light. Another witness says the street light has considerable reflection, and that, from his home, some 400 feet north, he can, by this light, see people walking across Cleveland Avenue, and that its light extends clear across the north side of the avenue. The motorman on the street car was coming back on the inbound car, on the west track, and passed the deceased coming up the tracks, and passed the interurban coming north on the east track, about 100 feet behind deceased. Witness says that he was about 50 or 75 feet north of Cleveland Avenue when he first saw deceased; that, at that time, deceased was just about on Cleveland Avenue, and was coming north in the center, between the two tracks; that deceased was walking between the two tracks, and, as the street car approached him, he moved over east, into the outbound track between the rails, out of the way of the street car. Witness says that a party by the name of Mansfield, with him in the car, remarked that the "interurban is going to get awfully close to that man," as deceased stepped over onto the east track in front of the interurban. Witness says he had no trouble in seeing Carr at that time; that he passed nobody else walking up or down the track, that morning, as his car was coming southward, toward Cleveland; that he saw deceased by the use of the headlight on his own car, and not by the interurban headlight, which he says did not strike deceased when

he first saw him; that deceased had a cap pulled down over his head, with a coat having a heavy collar turned up; that the street car was running about 5 miles an hour, when he crossed Cleveland, and he thought the interurban was coming at about 7 to 9 miles an hour when it crossed Cleveland; that the motorman on the interurban had turned his light down from high to low arc, after he got up close to the street car, and did not turn it on again until after he had passed the street car; that this was done under orders of the company, as the heavy lights blind the approaching street cars, or anybody who has to look toward them, and are intended only to throw a long light down the track; that witness did not sound his gong, as deceased stepped out of his way.

Mansfield, who was, at the time of the trial, an employee of defendant's, and who was in the car with the street car motorman, says he first saw the interurban car when it was about at Garfield Avenue; that the track along there runs in a curve from North Avenue to a point north of Cleveland Avenue, so that, when one is going south, he is not looking straight down the track when at Cleveland; that he saw the headlight on the interurban first, and then saw the car itself, when it was about at Garfield Avenue, one block south of Cleveland; that he had no trouble seeing the interurban that far; that, at that time, the street car was about 50 feet north of Cleveland; that he could then see the interurban car by the headlight of the street car; that, at that time, he also saw deceased, walking north between the two tracks; that he was then about on the south side of Cleveland Avenue, and the interurban was in sight about a block below him; that the interurban headlight was on low arc, not quite as bright as the street car light; that the interurban was running between 8 and 10 miles an hour, and the street car about 5; that the street car passed the interurban at the Cleveland Avenue crossing; that, at the point where the street car passed deceased, if he had looked behind him, he could have seen the interurban headlight; that, as the interurban got far enough around the curve, about half a block south of Cleveland, witness could see well enough to see into the car, and saw the interurban motorman ringing the bell; that, at that time, deceased was just about on Cleveland Avenue, and they passed him right

on the north edge of Cleveland; that the interurban headlight extended up to where he then was.

Witness Quinnette, a passenger, was sitting in the smoker of the interurban as they came into Thirty-third Street. He says he felt or heard it hit something; that it stopped right afterwards; that the brake must have been put on immediately afterwards; that the car stopped shortly afterwards; that he would say the brake went on afterwards, and not before; that the car stopped within a couple of car lengths, and everybody got off the car and went back; that deceased lay between the two tracks, close to the east rail of the west track. On cross-examination, he says he could not say exactly which happened first, the putting on of the brakes or the striking of the body, but that they could not have happened a great ways apart,—about the same time, as near as he could remember. He says he signed a statement, which he read over carefully, wherein he said:

"I heard the car hit something, heard it distinctly, and right after that, I heard the brake go on, and the car stopped."

He thinks the headlight on the interurban was burning then, and says the light in the car was burning. He says they came around a curve there, in going up the track; that he couldn't say where the curve stops.

Mrs. Whitmer, who lives on the south side of Cleveland, 100 feet west of the car line, says they came to her house to phone; that she saw deceased walking on the track, but did not know at the time who it was; that she saw the street car and the interurban; that the interurban was not far behind deceased, one or two car lengths; that he was a little north of the crossing, and the street car was coming south, and passed him while she was watching; that she saw the street car pass the interurban, a little south of the crossing; that she heard the crash of the car,—that is, the brakes as they went on; saw deceased walking up the track by the light of the street light; paid no attention to the headlight; didn't know whether the headlight was shining on him.

Dr. Ransom describes the injuries of deceased as a compound fracture of the skull over the left eye, and says that, back two inches, there was a hole the size of a quarter, or larger,

and numerous bruises on his body; and that the left side of his head was fractured. He died about 9:30 that morning.

Mr. Noble, testifying for plaintiff, as the abstract states,—though appellant states in argument that a part of Noble's testimony was offered on behalf of the defendant,—says he was the motorman on the interurban for six years, and says his car was about 50 feet long; that he had been operating it for some time; that it weighs about 37 tons; that, at a speed of 7 or 8 miles an hour, he could stop it in about 75 feet; at 10 miles, it would take about 100 feet; that it had good air brakes; that they were in good repair and working all right; that there is a curve in the track, as we approach Cleveland Avenue from the south.

"Going to the left, the rays from the headlight will bear to the right; on low arc, they do not show objects on the track while we are on a curve. 50 or 75 feet ahead of it, it is dim. There is a great deal of difference in the spread of it. When you look at it from the outside, it looks like a mild, dim light. Low arc throws no rays to speak of; high arc shows a strong light, and it spreads to the right and left from the front of the headlight more than the low. When I came around this curve from the south, up to Cleveland Avenue, I did not see deceased before I reached Cleveland Avenue. As I approached Cleveland, I had hold of the controller with my left hand, and was ringing the bell with my right. When I first saw him, I was about 20 or 25 feet from him. There was no point of time, say 100 yards south of there, that I was not engaged in looking straight ahead on the track. When I first saw him in front of me, I first saw him in the rays of the light—the rays of the light struck him. I applied the brakes immediately,—the air brakes,—and shut off the current. I could not say whether I got the brake applied before I hit him. I applied the brake and shut off the current as quick as I could. There was nothing I could have done there I did not do. When the light struck him, I saw just about the left part of his face—his left jaw. I could not see a man at that crossing until I came within 25 feet of him, unless he got within the rays of the light. I mean to say, my light was so poor I could not see him until I got within 25 feet of him. I did have a light by which I could see 300 or 400 feet, and all I had to do

was turn it on. The reason I did not was because I was meeting a street car. I knew where Cleveland Avenue was, and that it was a street crossing, and I knew that people were in the habit of going up and down those tracks. When I first saw the street car coming, I was about a block south of Cleveland, and the street car was then a block above Cleveland. There is a curve in there, not so awful short. I could see the street car by looking across, and not by looking right up the tracks. My car must be within 20 or 25 feet of Cleveland before I can see straight onto Cleveland between the rails of the track going north. I knew that before I pulled in around there that morning. I knew people were likely to be there. I shut off my strong light about a block below Cleveland, on account of meeting the other car, and also for the people that might be on the track; it is so strong that they can't locate us; they could not tell how far away I was. The rule for shutting it off is on account of the motorman that was approaching me; that is what my instructions were. I passed this street car at the south side of the crossing plank at Cleveland. The head end of my car was probably 10 feet south of the crossing plank when it went by the rear end of the street car, so that I was then somewhere from 40 to 50 feet from where I struck deceased. The man was about 50 feet north of the crossing plank of Cleveland when I was there just south of the plank as the street car passed me. As I passed the street car, I was just in the act of changing my light from low to high. Didn't put on the high arc after I turned it off a block away. The low arc might throw its rays ahead of the car, to my certain knowledge, 50 feet; that is as near as I could tell. Q. Didn't you testify before the coroner's inquest on that very question that, because you could see 100 feet ahead, and didn't you also say that, 'on the darkest night, and rain, I think I could see an object 100 feet ahead, probably more?' A. Possibly. That night was not cloudy. There was no moon. The street light was out, if I remember right; I don't remember; I would not swear it was out. My eyes were not dazzled by the street car light; I knew when I saw it that we were both going to pass each other just about on that crossing. The hitting the man and putting on the brake were so close together I would not undertake to say which was first. I ran

about 100 feet, or two car lengths, after I hit him. The street car had gone by me before I got to the planks on Cleveland, and deceased at that moment, or at least when I hit him, was 50 feet north of the planks at Cleveland. The planks were about 15 feet wide, so that the man was then about 65 feet north of the south end of the planks, and the street car passed me before I got to the planks. As I approached this crossing that morning, there was not anything that I was doing that in any way interfered with my operating my light and operating my brakes and controlling the car. Everything was clear.''

The motion to direct a verdict was on the ground that no negligence on the part of defendant had been shown; that deceased was guilty of contributory negligence; that, on the entire record, a verdict for plaintiff would not be permitted to stand.

1. We are of opinion that, considering all the circumstances, there was sufficient evidence to take the case to the jury on the question of defendant's negligence, as to whether the motorman was not careless in not keeping a proper lookout for persons on the track; whether, under all the circumstances, the car was moving at too high a rate of speed; and whether the motorman failed to put in operation means of stopping the car, after seeing deceased in a place of peril. He was familiar with the situation, and knew that it was frequently used by the public in the manner in which deceased was using it. It was his duty to use reasonable care in approaching the crossing in the respects mentioned. We are not prepared to say that he was negligent in not having the high arc light on at the time. His instructions were to turn it off, when meeting another car. If it had been on, the tendency would have been to blind the street car motorman, persons on the street, and the deceased, when he turned around to look, if he did so. But one phase of the evidence tends to show that the street light was not burning, and that the low arc light on the interurban was so dim that the motorman could not see a person on the track for a distance greater than it would take to stop the car at the speed it was traveling; so that, at this point, it was for the jury to say whether the motorman should not have driven the car at a lower speed, when his headlight was dim. We do not lose sight of the fact that there is a slight curve, and that, before reaching

the crossing, the headlight on the interurban would be thrown to the northeast, to some extent, until the car turned to the left enough so that the rays would strike the crossing. Further, the jury could have found from the evidence that the street light was lighted, and that a person could be seen upon the crossing by its rays for a distance considerably greater than the distance it would take to stop the car, going at the speed it was going. There was also some light thrown on the crossing by the head-light of the approaching street car. The jury could have found from the evidence that, from the street light, or from it and the street car headlight, the motorman should, as a matter of original negligence, have seen the deceased, or that he did, in fact, see him. Though the motorman testifies that he did not see deceased until he was within 20 or 25 feet, the jury could have found from the evidence that he could have seen him for a greater distance, and that he did, in fact, see him, notwithstanding the motorman's denial. Considering all the circumstances, the jury were not necessarily bound to accept his statement. His testimony is that he was looking all the time, for 100 yards, before reaching the crossing; and if so, he could have seen, and must have seen,—at least, the jury could have so found. A person with good eyes, looking in the direction of a bright full moon, and looking at it, but testifying that he did not see it, may not claim that his testimony that he did not see is a verity. Numerous cases so hold. The jury could have found from the evidence, too, that the motorman did not put in motion means at his command for stopping his car, after seeing deceased in a place of peril upon the tracks, or after he should have seen him, in the exercise of reasonable diligence in the first instance, and as a matter of original negligence. The evidence shows, or the jury could, at least, have so found, that the efforts of the motorman to stop, by putting on the brake, was at about the time deceased was struck. There may be other circumstances bearing on these points, but the foregoing were sufficient to take the case to the jury on the matters suggested. Without reviewing the cases, the following, among others which may be cited, give support to our conclusion: *Remillard v. Sioux City Traction Co.*, 138 Iowa 565, 567; *Carr v. Interurban R. Co.*, 185 Iowa 872, 878; *Watson v. Boone Elec. Co.*, 163 Iowa 316, 321.

2.  We think deceased was not guilty of contributory neg-
ligence, as a matter of law.  He had a right to walk along the
track, and between the rails, provided, of course, he used ordi-

2. NEGLIGENCE:     nary care under such circumstances.  There was
contributory
negligence: jury    no paving or sidewalks, and the track was the
question.         best place to walk.  It was known by the com-
pany that pedestrians did do that.  True, he must have known
that there was danger in walking on the track; and he had a
cap on and a collar around his ears, so that he could not as
readily hear.  But he had, just before, stepped to the east, on the
east track, to let the street car pass on the west track; and it
may properly be inferred that his attention was diverted by
the approach of the street car in front of him, and that he
stepped over on the other track to avoid it.  If he did look be-
hind him, the headlight on the interurban was so dim that he
might easily have mistaken it for some other light, or misjudged
the distance it was away, and the speed at which it was coming.
The evidence does not show that he did not look behind, from
time to time.  Some of the witnesses say they saw him on the
track shortly before he was struck, but they do not claim that
they observed him all the time.  It seems to us that the nature
of his injuries tends to show that he had just looked around to
his left, or was in the act of doing so.  He was on the east
track, or the track to his right.  After the accident, he was
found further west, or to his left.  His skull was fractured over
his left eye, and there were other injuries on the left side of his
face, or more nearly to the front of the side of his face, two inches
back of the injury over the eye.  The motorman says he saw the
left side of Carr's face when he saw him.  This would indicate
that Carr's face, or at least his left side, was towards the south,
or the approaching interurban.  He may have been struck by the
northwest corner of the interurban car, as he was in the act
of stepping off the east track to the west, and was struck and
thrown west by the impact.  We do not say that it did so happen,
but it is a legitimate inference, and it was for the jury to say.
We shall not review the cases bearing upon this question, but
see *Perjue v. Citizens' E. L. & G. Co.*, 131 Iowa 710; *Dow v.
Des Moines City R. Co.*, 148 Iowa 429, 442; *Long v. Ottumwa
R. & L. Co.*, 162 Iowa 11, 19; *Van Camp v. City of Keokuk*,

130 Iowa 716, 720; *Remillard v. Sioux City Traction Co.*, 138 Iowa 565, 567.

3. We have already indicated, in a prior division of the opinion, that the jury could have found from the evidence that the motorman on the interurban did, in fact, see deceased on the track in a position of danger, in time to have stopped the car before striking him. There are other circumstances bearing on the question of last clear chance. The evidence bearing on that is much the same as that which tends to support plaintiff's claim as to original negligence. Considering all the circumstances, it is doubtful whether there is enough to sustain plaintiff's claim as to. last clear chance; but as to this we do not determine at this time.

One of the brief points complains that the court erred in excluding certain evidence; but the pages of the abstract showing the rulings complained of are not given, nor are the names of the witnesses. In any event, the matter is not likely to occur on a retrial.—*Reversed and remanded.*